## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

James Bruno, individually and on behalf of all
others similarly situated,

          Plaintiff,

      - against -

American Textile Company, Incorporated,

          Defendant

1:22-cv-02937

Class Action Complaint

Jury Trial Demanded

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1.     American Textile Company, Incorporated ("Defendant") manufactures, markets, labels and sells sheet sets represented as having a thread count of 1250 under the Sealy brand ("Product").



## I.   HIGHER THREAD COUNTS ASSOCIATED WITH HIGHER QUALITY

2.    Thread count is used by consumers purchasing bedding as an indicator of fabric quality, with higher thread counts able to provide greater comfort, durability, and longevity relative to lower thread counts.

3.    Consumers rely on the represented thread count as a gauge of product quality.[1]

4.    Surveys confirm that consumers are willing to, and do pay, more for higher thread count sheets than lower thread count sheets.

5.    For instance, a single-ply 300-count costs $55 a set, while a 600 thread-count sheets are $180 a set.

6.    One informal survey of the prices of cotton king-size sheet sets at online retailers in 2016 confirmed that as thread count increased, so did the prices.

## II.   THREAD COUNT CALCULATIONS

7.    The common or standard practice in the United States bedding industry has been to count the number of threads in both the warp (vertical direction) and filling (horizontal direction).

8.    Common or standard practice counts each yarn as one thread, regardless of whether the yarn was a single-ply or multi-ply yarn.

9.    The American Society for Testing and Materials' ("ASTM") is a global standards organization that develops technical standards for a wide range of industries.

10.    ASTM Standard 3775 covers the standard test method for measuring warp end count and filling pick count and is applicable to all types of woven fabric.[2]

---

[1] ABC News, Are Shoppers Short-Sheeted by Thread Count?, Jan. 2006 (noting that customers "rely" on thread count as an important factor while shopping).
[2] Standard Test Method for Warp (End) Count and Filling (Pick) Count of Woven Fabrics; see also ASTM Designation: D3775-12.

11.    This Standard uses several industry-specific terms, defined below:[3]

| count | $n-$ *in woven textiles*, the number of warp yarns (ends) and filling yarns (picks) per unit distance as counted while the fabric is held under zero tension, and is free of folds and wrinkles. |
| end | $n-$ *in fabric*, an individual warp yarn (single or ply) or cord. |
| filling | $n-$ yarn running from selvage to selvage at right angles to the warp in a woven fabric. |
| pick | $n-$ an individual filling yarn. |
| pick count | $n-$ *in woven fabrics*, the number of filling yarns per unit fabric length. |

12.    The method for determining thread count requires "Count[ing] individual warp ends and filling picks as single units regardless of whether they are comprised of single or plied components."[4]

13.    When two yarns "are laid-in together and parallel," each yarn is required to be counted separately, "as a single unit, regardless of whether it is comprised of single or plied components."[5]

14.    However, not all manufacturers and sellers of sheets use this industry standard method for calculating thread counts.

15.    The National Textiles Association ("NTA") and the Federal Trade Commission ("FTC") recognized that counting plies in plied yarns individually inflates the thread count several times above what it would be if the traditional, industry standard method were used.

16.    The FTC stated that a result of this practice is that consumers are unable to accurately compare products, because their "thread counts that may have been calculated in two dramatically different ways." FTC Letter to National Textile Association, August 2, 2005.

17.    The FTC stated that "[C]onsumers could be deceived or misled by the practice of stating an inflated thread count, achieved by multiplying the actual count by the number of plies

---

[3] ASTM D 123-03, Standard Terminology Relating to Textiles.
[4] ASTM Designation: D3775-12 at 9.1.1.
[5] ASTM Designation: D3775-12 at 9.1.2.

within the yarn."

18. The FTC provided an example of a non-deceptive way to inform consumers of the thread count and the yarn ply, such as "300 thread count, 2 ply yarn," instead of "600 thread count," which "would likely mislead consumers about the quality of the product being purchased."

19. Deviation from industry standards has also drawn criticism from the American Textile Manufacturer's Institute ("ATMI").

20. Writing to the FTC, ATMI described how "extremely high [thread] counts are achieved by counting yarns within a ply as individual yarns, thus dramatically increasing the number of yarns in a square inch of fabric. ATMI Letter to FTC, January 31, 2002.

21. By "labeling products based on counting each individual yarn in plies," consumers' purchasing decisions are "based on false and misleading information."

22. In its reply to ATMI, the FTC agreed that it would review thread count claims which counted yarns within a ply as individual yarns in light of the significant weight afforded to the ASTM standards. FTC Letter to ATMI, March 18, 2002.

23. The FTC concluded by noting that material claims about a product must be supported by a "reasonable basis," and was skeptical that counting individual yarns within a ply to arrive at a total thread count met this criteria.

## III.   THREAD COUNT FOR PRODUCT IS FALSE AND MISLEADING

24. The representation that the Product's thread count is 1250 is false and misleading.

25. Laboratory analysis of Plaintiff's Product, pursuant to ASTM D 3775, shows it has 57 warp yarns and 166 weft yarns per inch, for a total thread count of 223. Exhibit "A."

4

| SAMPLE IDENTIFICATION: | SAMPLE #1 | SEALY PREMIUM COMFORT | 1250 Thread Count |
| --- | --- | --- | --- |
| | KING SHEET SUPERIOR MOISTURE WICKING | | |
| | FABRIC: 48% POLYESTER/44% COTTON/8% MODAL | | Made in India |
| | RN 17119    0 22415342513 | | |

END & PICK COUNT
ASTM D 3775

| | |
| --- | --- |
| Warp | 57 |
| Filling | 166 |
| | |
| Total Thread Count | 223 |

A deceptive count of each filament of each warp yarn
each filament yarn has 19 filaments

$$57 \times 19 = 1083$$
$$+ \quad 166$$
$$\text{Total Count} \quad 1249$$

26.     However, the 19 individual filaments in each warp yarn were counted as separate yarns, which is scientifically wrong based on the definition of fiber and yarn structures.

27.     Defendant calculated 1250 for the thread count by multiplying the number of warp yarns, 57, by the filaments in each warp yarn, 19, to reach 1083, and added 166 weft yarns, for a total of 1249.

28.     By counting the plied yarns individually, the Product's thread count is inflated by several times over what it would be if industry standard methods were used.

29.     The result was that the Product was of lower quality, softness, comfort, durability, and longevity than they otherwise would if they were the represented thread count and quality as stated on the labeling.

## IV.   CONCLUSION

30.     Defendant makes other representations and omissions with respect to the Product which are false and misleading.

31.     Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of a product, relative to itself and

other comparable products or alternatives.

32.    The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

33.    Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

34.    Had Plaintiff known the truth, he would not have bought the Product or would have paid less for it.

35.    As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $54.99 for the king or queen size sheet set, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

36.    Jurisdiction is pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

37.    The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

38.    The Product has been sold at thousands of locations in the states covered by the classes Plaintiff seeks to represent, with the representations challenged here, for many years.

39.    Plaintiff James Bruno is a citizen of Illinois.

40.    Defendant American Textile Company, Incorporated is a Pennsylvania corporation with a principal place of business in Duquesne, Allegheny County, Pennsylvania.

41.    The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

42. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here for several years, in thousands of locations, in the states covered by Plaintiff's proposed classes.

43. The Product is available to consumers from third-parties, which includes department stores, home furnishing stores, warehouse club stores, big box stores, and/or online.

44. Venue is in the Eastern Division in this District because a substantial part of the events or omissions giving rise to these claims occurred in Lake County, including Plaintiff's purchase, consumption, transactions and/or use of the Product and awareness and/or experiences of and with the issues described here.

Parties

45. Plaintiff James Bruno is a citizen of Mundelein, Lake County, Illinois.

46. Defendant American Textile Company, Incorporated is a Pennsylvania corporation with a principal place of business in Duquesne, Pennsylvania, Allegheny County.

47. Defendant's registered agent in its incorporation state is Corporation Service Company 2595 Interstate Dr Ste 103 Harrisburg PA 17110-9378.

48. Defendant is one of the largest textile manufacturers in the United States.

49. Defendant manufacturers bedding products for dozens of brands, including Sealy.

50. Sealy is known worldwide for its premium mattresses.

51. Consumers seeing Sealy sheets will expect similarly high levels of quality based on Sealy's reputation.

52. Plaintiff purchased the Product at locations including Walmart, walmart.com, between May 1, 2022 and May 31, 2022, among other times.

53. Plaintiff used the Product and suspected that the thread count was not as represented

based on the attributes of the Product including softness and comfort.

54.     Plaintiff believed and expected the thread count promised on the label was the thread count of the Product, and that this number was based on an industry standard calculation, instead of through methods which result in inflated thread counts because that is what the representations and omissions said and implied, on the front label and the absence of any reference or statement elsewhere on the Product.

55.     Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, hang tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

56.     Plaintiff bought the Product at or exceeding the above-referenced price.

57.     Plaintiff did not receive a product which had qualities of one with a thread count of 1250, because the Product lacked softness, comfort, and other qualities which it would have had if the thread count were based on industry standard calculations.

58.     Plaintiff would not have purchased the Product if he knew the representations and omissions were false and misleading or would have paid less for it.

59.     Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

60.     The Product was worth less than what Plaintiff paid and he would not have paid as much absent Defendant's false and misleading statements and omissions.

61.     Plaintiff intends to, seeks to, and will purchase the Product again when he can do so

with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition.

62.     Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar high thread count bedding products, because he is unsure whether those representations are truthful.

<u>Class Allegations</u>

63.     Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Montana, Kansas, Maine, Wyoming, Idaho, Kentucky, West Virginia, Kansas, Iowa, Mississippi, and Utah who purchased the Product during the statutes of limitations for each cause of action alleged.

64.     Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

65.     Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

66.     Plaintiff is an adequate representative because his interests do not conflict with other members.

67.     No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

68.     Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

69. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

70. Plaintiff seeks class-wide injunctive relief because the practices continue.

Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, et seq.

(Consumer Protection Statute)

71. Plaintiff incorporates by reference all preceding paragraphs.

72. Plaintiff believed the thread count promised on the label was the thread count of the Product, and that this number was based on an industry standard calculation, instead of through methods which result in inflated thread counts.

73. Defendant's false, misleading and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

74. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

75. Plaintiff relied on the representations and omissions to believe the thread count promised on the label was the thread count of the Product, and that this number was based on an industry standard calculation, instead of through methods which result in inflated thread counts.

76. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

77. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or

deceptive business practices in the conduct of commerce.

78. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

79. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

80. As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

81. Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

82. The Product was manufactured, identified, marketed and sold by Defendant and expressly and impliedly warranted to Plaintiff that the thread count promised on the label was the thread count of the Product, and that this number was based on an industry standard calculation, instead of through methods which result in inflated thread counts.

83. Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

84. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

85. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that the thread count

promised on the label was the thread count of the Product, and that this number was based on an industry standard calculation, instead of through methods which result in inflated thread counts.

86.    Defendant's representations affirmed and promised that the thread count promised on the label was the thread count of the Product, and that this number was based on an industry standard calculation, instead of through methods which result in inflated thread counts.

87.    Defendant described the Product so Plaintiff believed the thread count promised on the label was the thread count of the Product, and that this number was based on an industry standard calculation, instead of through methods which result in inflated thread counts, which became part of the basis of the bargain that it would conform to its affirmations and promises.

88.    Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

89.    This duty is based on its outsized role in the market for this type of Product, selling under a trusted brand in the area of bedding and sleep products.

90.    Plaintiff recently became aware of Defendant's breach of the Product's warranties.

91.    Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

92.    Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

93.    Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

94.    The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

95.     The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if the thread count promised on the label was the thread count of the Product, and that this number was based on an industry standard calculation, instead of through methods which result in inflated thread counts.

96.     The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected the thread count promised on the label was the thread count of the Product, and that this number was based on an industry standard calculation, instead of through methods which result in inflated thread counts, and he relied on Defendant's skill and judgment to select or furnish such a suitable product, based on qualities and attributes such as comfort and softness.

97.     Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

98.     Defendant had a duty to truthfully represent the Product, which it breached.

99.     This duty was non-delegable, based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted brand in the area of bedding and sleep products.

100.   Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

101.   These promises were outside of the standard representations that other companies

may make in a standard arms-length, retail context.

102. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

103. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

104. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

105. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that the thread count promised on the label was the thread count of the Product, and that this number was based on an industry standard calculation, instead of through methods which result in inflated thread counts.

106. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

107. Defendant knew of the issues described here yet did not address them.

108. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

<u>Unjust Enrichment</u>

109. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   June 4, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com